**SCULLY SIGNAL COMPANY**

v.

**Arthur JOYAL, Robert J. Dislets, Universal Control Systems, Ltd., Joseph L. Munoz, Laurence L. Lampert, and William R. Backman, Jr.**

Civ. A. No. 94–0144P.

United States District Court,
D. Rhode Island.

March 16, 1995.

Ieuan G. Mahony, Sherburne, Powers & Needham, P.C., Barry J. Kusinitz, Corrente, Brill & Kusinitz, Ltd., Providence, RI, for plaintiff.

M. Kathryn Mainelli, McGovern, Noel & Benik, Providence, RI, for defendants.

## ORDER

PETTINE, Senior District Judge.

The Report and Recommendation of United States Magistrate Judge Robert W. Lovegreen filed on February 6, 1995 in the above-

captioned matter is hereby accepted pursuant to 28 U.S.C. § 636(b)(1).

The Magistrate Judge's recommendation that the defendants' Joseph L. Munoz, Laurence L. Lampert and William R. Backman, Jr.'s motion to dismiss be denied; defendants' motion for partial summary judgment be granted as to Count VII, and granted as to Counts V and VI without prejudice to plaintiff bringing common law claims as set forth in the Magistrate Judge's Report and Recommendation, part II.D; and defendants' motion as to Counts IV and VII of the Second Amended Complaint be denied is hereby approved.

In light of the foregoing Order, I need not reach the issue of whether defendants' notice of appeal was untimely.

SO ORDERED:

## REPORT AND RECOMMENDATION

LOVEGREEN, United States Magistrate Judge.

Before me are two motions. The first is defendants', Joseph L. Munoz ("Munoz"), Laurence L. Lampert ("Lampert") and William R. Backman, Jr.'s ("Backman"), motion to dismiss for lack of *in personam* jurisdiction and failure to state a claim upon which relief can be granted pursuant to Fed. R.Civ.P. 12(b)(2) and (6) respectively. The second is defendants', Arthur Joyal ("Joyal"), Robert J. Desilets ("Desilets") and Universal Control Systems, Ltd.'s ("Universal"), motion for partial summary judgment on Counts IV through VIII of the Second Amended Complaint pursuant to Fed.R.Civ.P. 56(c).[1] Munoz, Lampert and Backman indicated that they join in the motion for partial summary judgment if they are not successful on their motion to dismiss. The plaintiff brought this action, alleging claims for, *inter alia*, misappropriation of trade secrets, breach of contract, intentional interference with contract, unfair competition and deceptive trade practices and unjust enrichment.

These matters have been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B) and Local Rule of Court 32(c). For the following reasons, I recommend that Munoz, Lampert and Backman's motion to dismiss be denied and defendants' motion for partial summary judgment be granted as to Count VII, granted as to Counts V and VI without prejudice to plaintiff bringing common law claims as described *infra* part II.D. and denied as to Counts IV and VIII of the Second Amended Complaint.

### Facts

Neither party submitted a statement of facts that was temporally explicative of this matter. The following rendition of the facts relevant to the present motions has been culled from the various pleadings, memoranda and exhibits that both parties have submitted. The first section contains facts alleged in the Second Amended Complaint that I relied upon in deciding the motion to dismiss. The second section sets forth facts submitted to the Court in the form of various exhibits as relevant to the motion for partial summary judgment. When a fact is in dispute it is so noted.

### Facts Relevant to the Motion to Dismiss

Munoz and Lampert served as incorporators of Universal and now serve as Secretary and Treasurer, and President, respectively. (Second Amended Complaint ¶¶ 38 and 41.) Upon incorporation they issued to themselves an undetermined number of shares of common stock without any initial capital investment by either in Universal. *Id.* ¶ 40. Further, Universal did not receive any capital contributions from any source upon incorporating. *Id.* ¶ 43. Pursuant to an agreement with Munoz, Backman possesses an undetermined equity ownership interest in Universal as compensation for his service as Marketing Manager of the Fueltrack Project. *Id.* ¶ 42. Universal has not held Board of Directors or shareholders meetings.

---

1. The defendants originally brought this motion seeking partial summary judgment as to the First Amended Complaint, but it was referred to me and set for hearing along with the plaintiff's motion to file a Second Amended Complaint.

That motion to amend was granted, and defendants thereafter directed their motion for partial summary judgment against the Second Amended Complaint at the same time their motion to dismiss was heard.

*Id.* ¶ 44. Official minutes are not kept in connection with any corporate meetings that are held by Universal's officers. *Id.* ¶ 45. Munoz has regularly paid disbursements and expenses incurred on behalf of Universal out of accounts held in the name of other corporate entities in which he possesses an interest, such as Caribbean Motors. *Id.* ¶ 46. Universal was incorporated for the purpose of promoting fraud by infringing the proprietary technology and trade secrets embodied in plaintiff's Prodigy system, a computerized fuel management system, for use in Universal's Fueltrack fuel management system. *Id.* ¶ 48.

### *Facts Relevant to the Motion for Partial Summary Judgment*

Defendant Joyal was employed by the Raytheon Company ("Raytheon") as an engineer from 1958 through 1992. Defendant Desilets has been employed by Raytheon as an engineer since 1984. Outside of their work for Raytheon, both men had worked with Integrated Fuel Technology ("IFT") to develop a computerized fuel management system that would be called Prodigy. Apparently, IFT was unable to amass the capital needed to complete Prodigy, and thus, the project stalled. In approximately September of 1990, Joyal placed a call to Munoz, described the Prodigy project to him briefly and asked if he might be interested "in supporting the project." (Joyal Depo., Pl.'s Ex. 10 at 96, 99.) Munoz was not then interested. *Id.* Thereafter, plaintiff Scully acquired all of the assets and proprietary technology of IFT, and on September 7, 1991, Scully entered into a Design and Development Agreement (the "D and D Agreement") with Joyal and Desilets to continue working on Prodigy as independent contractors (Defs.' Ex. F).

Under the D and D Agreement, Joyal and Desilets agreed to complete their work on Prodigy "in a professional fashion in accordance with the best engineering standards," *id.* at 500527, and to "use their best efforts" to complete the Prodigy system through the stage of engineering prototype, *id.* at 500528. The D and D agreement also states that

[Joyal and Desilets] agree[ ] to assign all . ... right, title and interest in all inventions, discoveries, products, processes and computer programs which [have been] conceived or developed in connection with the Work ... to Scully. . . .

\* \* \* . \* \* \*

[Joyal and Desilets] agree[ ] that, upon completion of the Work, [they] will promptly deliver to Scully any papers, drawings, blueprints, manuals, letters, notes, notebooks, reports, diskettes or other machine-readable media or other material relating to the Prodigy Project which are or in the future will be in [their] possession or under [their] control.

Neither of the Engineers shall, either during or after completion of the Work divulge to anyone or use for his own or another's benefit, any information (including designs, specifications, and software programs) embodied in the Prodigy system unless duly authorized in writing by an officer of [Scully].

*Id.* at 500533–34. The agreement further provided that Joyal and Desilets would furnish Scully with a list of all modifications that needed to be made to Prodigy and provide on the job training to Scully's engineers relating to the technology, manufacturing, assembly and testing of Prodigy. *Id.* at 500542. The D and D Agreement also states: "This Agreement shall be governed by the laws of the Commonwealth of Massachusetts without giving effect to the principles of conflicts of law." *Id.* at 500534.

Joyal and Desilets contend that all the work under the D and D Agreement was completed in January of 1992 and that a prototype was successfully demonstrated to Scully as per the D and D Agreement in February, 1992. (Joyal Depo., Pl.'s Ex. 10 at 141; Joyal Aff., Defs.' Ex. A ¶¶ 6–7; Desilets Aff., Defs.' Ex. C ¶¶ 6–7.) Joyal testified at his deposition that in January of 1992, when he and Desilets turned over Prodigy to Scully, the system was functioning and that he never formed a belief that a complete redesign of Prodigy would have been in order. (Joyal Depo., Defs.' Ex. B at 159.) Nevertheless, Joyal testified previously in the same deposition that as of February, 1992, he felt

that a complete redesign of Prodigy was in order to prevent the system from being outdated. (Joyal Depo., Pl.'s Ex. 10 at 153–54.) Further, Joyal did not discuss any of the perceived disadvantages of the Prodigy system with Scully engineers. (Joyal Depo., Pl.'s Ex. 16 at 23.)

Plaintiff disputes that Joyal and Desilets completed their work for Scully in February of 1992 in accord with the D and D Agreement. Scully submits a letter from Desilets to a Scully employee dated September 13, 1992 which references computer disks with design information that Desilets was returning to Scully with the letter and states: "This should bring to a close this one remaining issue left open under the Design and Development Agreement." (Pl.'s Ex. 9.) Robert Scully, President of plaintiff Scully, testified by affidavit that the February 22, 1992 testing of Prodigy was not wholly successful and that the system did not appear to function until Joyal and Desilets succeeded in "jury-rigging" it to perform. (Scully Aff., Pl.'s Ex. 1 ¶ 7.) Further, Scully engineers contacted Joyal and Desilets by mail and phone through October, 1992 to get Joyal and Desilets to provide the training and instruction on Prodigy, to disclose confidential information, including source codes, and to provide the necessary documentation and models, all of which was agreed upon in the D and D Agreement. *Id.* ¶ 9. In fact, Robert Scully states that Desilets visited Scully's testing site for Prodigy as late as January, 1993 to consult with Scully engineers pursuant to the D and D Agreement. *Id.* ¶ 10.

Sometime in early 1992, Joyal called Munoz looking for a technical project to become involved in. (Joyal Depo., Pl.'s Ex. 10 at 141.) Munoz had nothing for Joyal at the time but called Joyal back in February or March of 1992, because he had some potential export interest in a computerized fuel management system. *Id.* at 142. Joyal informed Munoz in that call that the fuel management project that he had called Munoz regarding in September of 1991 had been picked up by Scully but that the work on that project had been completed. *Id.* at 145. After these conversations, Universal was incorporated in early 1992 by Munoz and Lampert

for the purpose of developing a computerized fuel management system. (Munoz Depo. at 15, 59.) Joyal and Desilets began to work for Universal approximately in early March, 1992 (Joyal Aff., Defs.' Ex. A. ¶ 9; Joyal Depo., Defs.' Ex. B at 162; Desilets Depo., Pl.'s Ex. 12 at 76), and work began on a computerized fuel management system called Fueltrack in March or April of 1992. (Munoz Depo. at 61).

Joyal and Desilets contend that they never divulged any proprietary or confidential information from the Prodigy project to anyone at Universal, that in developing Fueltrack they did not use any of the drawings, proprietary information or data that they had developed or had access to working on Prodigy and that Fueltrack's design, specifications and software programs are completely different from Prodigy. (Joyal Aff., Defs.' Ex. A ¶¶ 10–12; Desilets Aff., Defs.' Ex. C ¶¶ 10–12.) Desilets testified that he retained some general knowledge, information and source codes on computer disk from his work with Scully (Desilets' Depo., Pl.'s Ex. 12 at 86, 90), and some of these source codes may have been incorporated into the source code for Universal's Fueltrack system, *id.* at 89. Further, John S. Mark, a software developer and consultant, testified by affidavit on Scully's behalf that "substantial portions of FUELTRACK software must have been produced either directly (i.e. verbatim copying) or indirectly (i.e. utilizing the same functionality and design) from PRODIGY software, and that the design and implementation of the PRODIGY software formed the basis for the FUELTRACK software." (Mark Aff., Pl.'s Ex. 2 ¶ 24.)

The software for Fueltrack was completed in the late spring of 1992 (Desilets' Depo., Pl.'s Ex. 12 at 92), and the system was ready to be tested in January of 1993, *id.* at 93; Joyal Depo., Defs. Ex. B at 175.

Munoz states by affidavit that he was not aware of the D and D Agreement until he was shown the agreement in October of 1993. (Munoz Aff., Defs.' Ex. G ¶ 3.) In his deposition he acknowledged that at some time during the association of Universal and Joyal and Desilets, Universal was informed of an existing agreement between Joyal and Desi-

lets and Scully, but he could not recall when that occurred. (Munoz Depo. at 72.) He later testified that he had no knowledge of the D and D Agreement until he received a copy of it from Joyal sometime after December 22, 1993. *Id.* at 73–75. Joyal testified that he did not recall when he told Munoz of the D and D Agreement or whether he provided Munoz with a copy of the D and D Agreement. (Joyal Depo., Defs.' Ex. I at 210–11.) Desilets testified at his deposition that he felt constrained by the D and D Agreement in that "it wouldn't be right for [him] to take what [he and Joyal] had done for Scully and use that for [his] own benefit...." (Desilets Depo., Pl.'s Ex. 12 at 77.) He also testified over objection that he thought that this constraint would have been something that Munoz should know about in embarking on Fueltrack and that he may have informed Munoz about the constraints of the D and D Agreement as early as the Spring of 1992, but could not recall exactly and therefore did not want to state when it was. *Id.* at 78. Munoz testified that he did not recall speaking to Desilets regarding the D and D Agreement prior to seeing it after December 22, 1993. (Munoz Depo. at 78, 85.)

### Discussion

### I. Motions to Dismiss

#### A. Fed.R.Civ.P. 12(b)(2) and (6) Standards

■ Federal Rule of Civil Procedure 12(b)(2) provides for dismissal of an action against an individual the court has no *in personam* or personal jurisdiction over. In *Boit v. Gar–Tec Products, Inc.*, 967 F.2d 671 (1st Cir.1992), the United States Court of Appeals for the First Circuit held that a court may choose from one of three methods in determining a motion pursuant to Fed. R.Civ.P. 12(b)(2). *Id.* at 674. Under any of these methods "the plaintiff bears the burden of showing that jurisdiction exists." *Id.* at 674–75 (quoting *Ealing Corp. v. Harrods Ltd.*, 790 F.2d 978, 979 (1st Cir.1986)). The court may require the plaintiff to make a *prima facie* showing of personal jurisdiction, to show a likelihood of the existence of each fact necessary to support personal jurisdiction or to prove that jurisdiction exists over a

defendant by a preponderance of the evidence. *Id.* at 675–77. In making this choice, the court should determine, under the circumstances of the particular case, which standard of proof would most fairly determine whether the out of state defendant should be forced to incur the expense and burden of a trial on the merits in the local forum. *Id.* at 676.

■ In the instant case, the plaintiff submitted a number of exhibits in objection to the motion to dismiss and the defendants moved to exclude those exhibits. At oral argument on the instant motions, the parties agreed that the facts as alleged in the plaintiff's Second Amended Complaint should be taken as true for the purposes of the motion to dismiss and that the Court should confine itself to those facts in determining the motion. I acquiesced in this request. Therefore, it is most appropriate to apply the *prima facie* standard enunciated in *Boit, id.* at 675. I note that ordinarily, "[t]he *prima facie* showing of personal jurisdiction must be based on evidence of specific facts set forth in the record" and that the " 'plaintiff must go beyond the pleadings and make affirmative proof.' " *Id.* (citations omitted). In light of the parties agreement, however, this requirement is not necessitated here. For the purposes of the motion to dismiss, the defendants have agreed to the facts as alleged in the Second Amended Complaint, and that agreement obviates the need for plaintiff to put on further proof. As a result of applying the *prima facie* standard, "a denial of the motion to dismiss is an implicit deferral until trial of the final ruling on jurisdiction." *Id.* at 678.

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of an action if that action fails to state a claim upon which relief can be granted. The First Circuit Court of Appeals has recognized a tension among precedents regarding the particularity of pleading required to overcome a Rule 12(b)(6) motion and has noted that "the degree of specificity with which the operative facts must be stated in the pleadings varies depending on the case's context." *Boston & Maine Corp. v. Town of Hampton*, 987 F.2d

855, 863 (1st Cir.1993) (quoting *U.S. v. AVX Corp.,* 962 F.2d 108, 115 (1st Cir.1992)).

In deciding a Rule 12(b)(6) motion, "the court must accept the well-pleaded factual averments of the ... complaint as true, and construe these facts in the light most flattering to the [plaintiff's] cause...." *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 514 (1st Cir.1988) (quoting *Chongris v. Board of Appeals,* 811 F.2d 36, 37 (1st Cir.), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987)). Further, "the Court must deny a motion to dismiss if the allegations of the complaint permit relief to be granted on any theory, even one not expressly stated therein." *O'Neil v. Q.L.C.R.I.,* 750 F.Supp. 551, 553 (D.R.I.1990). "Nevertheless, minimal requirements are not tantamount to nonexistent requirements." *Gooley v. Mobil Oil Corp.,* 851 F.2d at 514. "[A] plaintiff ... is ... required to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Id.* at 515.

## B. Piercing the Corporate Veil

The central issue to the motions to dismiss under both Fed.R.Civ.P. 12(b)(2) and (6) is whether the allegations in the Second Amended Complaint, taken as true, support the piercing of Universal's corporate veil, thereby making Munoz, Lampert and Backman subject to the jurisdiction of this Court and liable for the acts attributable to Universal. Munoz and Lampert both argue that they have no personal contacts with the State of Rhode Island such that this Court has jurisdiction over them and that jurisdiction may not be exerted over them simply because of the positions they hold with Universal which they concede is subject to the personal jurisdiction of this Court. Munoz, Lampert and Backman join in arguing that the Second Amended Complaint fails to state a claim against them upon which relief can be granted, as they are shielded from liability for the acts of Universal because of its corporate status. Based on the following analysis, I find that Universal's corporate veil should be pierced, and therefore, the motions to dismiss should be denied.

"[W]hile it is generally true that questions of '[l]iability and jurisdiction are independent,'" *United Elec. Workers v. 163 Pleasant Street Corp.,* 960 F.2d 1080, 1091 (1st Cir.1992) (quoting *Sher v. Johnson,* 911 F.2d 1357, 1365 (9th Cir.1990)), the factors considered for purposes of piercing the corporate veil in the liability context also inform the jurisdictional inquiry. *Id.* Generally, a corporation is treated as a separate legal entity and its liabilities are not attributable to its owners and officers. *See Vennerbeck & Clase Co. v. Juergens Jewelry Co.,* 53 R.I. 135, 138, 164 A. 509 (1933). Likewise, ordinarily, jurisdiction may not be asserted over a corporate owner or officer simply because jurisdiction exists over the corporation. *Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d 902, 906 (1st Cir.1980). However, the corporate separateness which shields an owner from liability and personal jurisdiction may be disregarded under certain conditions, the result being that if the corporation is found liable or subject to the jurisdiction of the court, the owner is likewise subject to liability and personal jurisdiction. *See R & B Elec. Co., Inc. v. Amco Const. Co., Inc.,* 471 A.2d 1351, 1354 (R.I.1984) (holding a corporate entity may be disregarded and treated as an association of persons); *United Elec. Workers v. 163 Pleasant Street Corp.,* 960 F.2d at 1091 (holding that if a subsidiary is properly subject to the court's jurisdiction and its corporate independence may be disregarded, the parent is subject to the court's jurisdiction); *Donatelli v. National Hockey League,* 893 F.2d 459 (1st Cir.1990) (same).

The question then becomes under what circumstances may the corporate veil be pierced. Before answering, I note that the laws of New York, Rhode Island and Massachusetts are potentially applicable to this question. Thus, a potential conflict of law exists that must be resolved according to Rhode Island's choice of law rules. *See Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The preliminary questions to be answered are: first, does each state involved have sufficient contacts with the parties and occurrences underlying the action to make application of any of the state's laws constitutionally

permissible; and second, what is the nature of the conflict between the laws of those states. *Roy v. Star Chopper Co., Inc.,* 584 F.2d 1124, 1128 (1st Cir.1978) (citing *Woodward v. Stewart,* 104 R.I. 290, 243 A.2d 917, 921, 923 (1968); *Tiernan v. Westext Transport, Inc.,* 295 F.Supp. 1256, 1263 (D.R.I. 1969)), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979). It does appear that New York, Rhode Island and Massachusetts all have sufficient contacts with this action. Universal is a New York corporation with its principal place of business in that state. On the other hand, Backman, Joyal and Desilets are Rhode Island residents, plaintiff is a Massachusetts corporation, many of the wrongs Universal and the other defendants are alleged to have committed occurred in Rhode Island, and plaintiff's injuries are alleged to have been incurred in Massachusetts. Nevertheless, the laws of these jurisdictions pertaining to piercing the corporate veil are not in conflict, but instead are congruous, thus saving us from trekking down the arduous path of interest analysis.

In *Pepsi–Cola Metro. Bottling Co., Inc. v. Checkers, Inc.,* 754 F.2d 10 (1st Cir.1985), the First Circuit, looking to a number of Massachusetts cases, found that under Massachusetts law the general rule is that "shareholders may be held liable where they control the operation of the corporation and run it for their personal benefit, and where justice requires that the separate existence of the corporation be ignored." *Id.* at 16. In Rhode Island, "[i]t is well settled that the corporate entity should be disregarded and treated as an association of persons only when the facts of a particular case render it unjust and inequitable to consider the subject corporation a separate entity. This will occur when the corporate entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime * * *." *R & B Elec. v. Amco Const.,* 471 A.2d at 1354 (quoting *Vennerbeck & Clase Co. v. Juergens Jewelry Co.,* 53 R.I. at 139, 164 A. 509). In *Muirhead v. Fairlawn Enterprise,* 72 R.I. 163, 48 A.2d 414 *reargument denied,* 49 A.2d 316 (R.I.1946), the Rhode Island Supreme Court acknowledged the trial court's finding that a defendant corporation had failed to observe corporate formalities by keeping no permanent corporate records of any kind, no books of account and no checking account or any other form of depository account and held that the unity of interest and ownership between the corporation and its owner was that such that the adherence to the principle of their separate existence would result in injustice. *Id.* 48 A.2d at 418–19.

In New York, "courts will pierce the corporate veil only to prevent fraud, illegality or to achieve equity.... [T]he relevant factors to consider in making this determination are: '(1) domination and control over [the] corporation by those held liable which is so complete that the corporation has no separate mind, will, or existence of its own; (2) use of this domination and control to commit fraud or wrong or any other dishonest or unjust act; and (3) injury or unjust loss resulting to plaintiff from said control and wrong.'" *N.Y. Assoc. for Retarded Children, Inc., v. Keator,* 199 A.D.2d 921, 606 N.Y.S.2d 784, 785 (1993) (citations omitted). Like Rhode Island, New York law allows disregard of corporate entities in "the absence of any external indicia of separate corporate identity, such as the keeping of corporate records and bank accounts...." *McMullin v. Pelham Bay Riding, Inc.,* 190 A.D.2d 529, 593 N.Y.S.2d 27, 28 (1993).

In this case, considering the agreed upon facts set out in the Second Amended Complaint, it would be unjust and inequitable to recognize Universal as a separate and distinct corporate entity. Munoz and Lampert served as incorporators of Universal and now serve as Secretary and Treasurer, and President, respectively. (Second Amended Complaint ¶¶ 38 and 41.) Upon incorporation they issued to themselves an undetermined number of shares of common stock without any initial capital investment by either in Universal. *Id.* ¶ 40. Further, Universal did not receive any capital contributions from any source upon incorporating. *Id.* ¶ 43. Pursuant to an agreement with Munoz, Backman possesses an undetermined equity ownership interest in Universal as compensation for his service as Marketing Manager of the Fueltrack project. *Id.* ¶ 42. Universal has not held Board of Directors or shareholders meetings. *Id.* ¶ 44. Official

minutes are not kept in connection with any corporate meetings that are held by Universal's officers. *Id.* ¶ 45. Munoz has regularly paid disbursements and expenses incurred on behalf of Universal out of accounts held in the name of other corporate entities in which he possesses an interest, such as Caribbean Motors. *Id.* ¶ 46. Universal was incorporated for the purpose of promoting fraud by infringing the proprietary technology and trade secrets embodied in Scully's Prodigy system for use in Universal's Fueltrack system. *Id.* ¶ 48.

■ Clearly, these facts demonstrate that Universal was little more than a shell, with no finances or corporate structure or formality and controlled by its owners, Munoz, Lampert and Backman, such that it would be inequitable to recognize it as a separate legal entity. Under these circumstances, where the owners of a close corporation glaringly failed to observe the corporation's separate existence, it is in the interest of justice to pierce the thread bare corporate veil. Thus, Scully has stated claims against Munoz, Lampert and Backman individually. Moreover, as the defendants have conceded this Court's jurisdiction over Universal, personal jurisdiction may also be exercised over Munoz, Lampert and Backman. Consequently, their motions to dismiss should be denied.

## II. Motion for Summary Judgment

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) states that a party shall be entitled to a summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When determining a motion for summary judgment, I must review the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. *Mesnick v. General Electric Co.,* 950 F.2d 816, 820 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Griggs–Ryan v. Smith,* 904 F.2d 112,

115 (1st Cir.1990). Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993); *Lawrence v. Northrop Corp.,* 980 F.2d 66, 68 (1st Cir.1992).

■ Summary judgment is a procedure that involves shifting burdens between the moving and the nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case." *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir.1990) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)). Once the moving party meets this burden, the onus falls upon the nonmoving party, who must oppose the motion by presenting facts that show that there is a "genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (citing Fed.R.Civ.P. 56(e)); *see Goldman,* 985 F.2d at 1116; *Lawrence,* 980 F.2d at 68; *Garside,* 895 F.2d at 48 ("[A] 'genuine issue' exists if there is 'sufficient evidence supporting this claimed factual dispute' to require a choice between 'the parties' differing versions of the truth at trial." (quoting *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976))). To oppose the motion successfully, the nonmoving party "may not rest upon mere allegation or denials of his pleading." *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. Moreover, the evidence presented by the nonmoving party " 'cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.' " *Mesnick,* 950 F.2d at 822 (quoting *Mack v. Great Atl. & Pac. Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989)). Indeed, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, im-

probable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). Thus, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." *Goldman*, 985 F.2d at 1116 (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11).

### B. Governing Law

The parties do not assert that the State of New York has any significant contacts with the issues raised in the motion for partial summary judgment and accordingly do not contend that the law of New York applies to this motion. The only claims that the parties are in dispute as to which law governs are the unfair competition and deceptive trade practices claims found in Counts V and VI of the Second Amended Complaint. As to those Counts, defendant argues that Rhode Island law applies and plaintiff counters that Massachusetts law applies. As to the remaining Counts addressed by this motion, it is clear that the laws of Rhode Island and Massachusetts do not conflict, and therefore, those Counts may be decided under the laws of both states without any difficulty. The choice of law issue regarding Counts V and VI will be decided within the section of this opinion specifically addressing those claims.

### C. Count IV—Intentional Interference with Contract Against Universal Control, Munoz, Lampert and Backman

Defendants' motion for summary judgment on plaintiff's intentional interference with contract claims in Count IV of the Second Amended Complaint should be denied. In order to prevail on a claim of intentional interference with a contract, a plaintiff must establish: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional interference with that contract; and (4) injury resulting therefrom. *DiBiasio v. Brown & Sharpe Mfg. Co.*, 525 A.2d 489, 493 (R.I. 1987); *G.S. Enterprises, Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 571 N.E.2d

1363, 1369 (1991). A defendant's knowledge of the contract is judged by the objective, "reasonable person standard." *DiBiasio v. Brown & Sharpe Mfg. Co.*, 525 A.2d at 493; *Ryan, Elliott & Co., Inc. v. Leggat, McCall & Werner*, 8 Mass.App.Ct. 686, 396 N.E.2d 1009, 1013 (1979) (upholding the trial court's denial of liability for interference with contract where it was found the defendant reasonably did not know of the contractual term he had interfered with). Further, in order to be actionable, the interference itself must be improper. *C.N.C. Chemical Corp. v. Pennwalt Corp.*, 690 F.Supp. 139, 142 (D.R.I.1988) (citing *Federal Auto Body Works, Inc. v. Aetna Casualty & Surety Co.*, 447 A.2d 377, 379–80 (R.I.1982)); *G.S. Enterprises, Inc. v. Falmouth Marine, Inc.*, 571 N.E.2d at 1369. Whether the interference is improper is judged by the nature of the means or the motive of the defendant. *C.N.C. Chemical Corp. v. Pennwalt Corp.*, 690 F.Supp. at 142; *G.S. Enterprises, Inc. v. Falmouth Marine, Inc.*, 571 N.E.2d at 1370.

In the present case, Universal Control, Munoz, Lampert and Backman's only defense to Count IV is that they did not know of the D and D Agreement until October, 1993 and therefore could not have induced Joyal and Desilets to break the agreement with Scully. Two material disputes of fact over when these defendants knew of the D and D Agreement prevent summary judgment in favor of the defendants on Count IV. First, plaintiff asserts that these defendants and Joyal and Desilets were joint venturers and thus Joyal and Desilets' knowledge of the D and D Agreement is properly attributable to the other defendants at the outset of their relationship to produce Fueltrack. Preliminarily, analyzing these parties as joint venturers is appropriate in light of my finding that Universal's corporate veil should be pierced. I am aware that in making this finding *supra* part I.B., I confined myself to the facts as alleged in the Second Amended Complaint, an exercise that is improper under the standard for summary judgment pursuant to Fed.R.Civ.P. 56. Nevertheless, this finding is appropriately reaffirmed in the context of this summary judgment motion, as Munoz confirmed in his deposition all of the facts alleged in the Second Amended Com-

plaint relating to piercing Universal's corporate veil.[2] With the facts alleged in the complaint and relied upon by me in piercing Universal's corporate veil on the motion to dismiss confirmed by Munoz, it is without difficulty that I similarly find Universal's corporate veil should be pierced in the context of this motion for summary judgment. Thus, the defendants' status as joint venturers should be considered in determining whether knowledge of the D and D Agreement is properly imputable among them.

A joint venture is an association of two or more persons to carry out a single business enterprise for profit. *McAleer v. Smith*, 728 F.Supp. 857, 861 (D.R.I.1990) (citing *Fireman's Fund Ins. Co. v. E.W. Burman, Inc.*, 120 R.I. 841, 391 A.2d 99, 101 (1978)); *Gurry v. Cumberland Farms, Inc.*, 406 Mass. 615, 550 N.E.2d 127, 133 (1990); *Shain Investment Co., Inc. v. Cohen*, 15 Mass.App.Ct. 4, 443 N.E.2d 126, 130 (1982). Generally speaking, a joint venture is a partnership except that it differs in that it is ordinarily limited to a single enterprise or transaction whereas a partnership is usually formed to transact a general business. *Gurry v. Cumberland Farms, Inc.*, 550 N.E.2d at 133; *Shain Investment Co., Inc. v. Cohen*, 443 N.E.2d at 129–130. Thus, the law governing the relationship between partners is applicable to joint venturers. *Loft v. Lapidus*, 936 F.2d 633, 637 n. 6 (1st Cir.1991) (stating that the rights of parties are no different whether their relationship is termed a partnership or a joint venture); *McAleer v. Smith*, 728 F.Supp. at 861 (holding that "as with partnerships, mutual agency exists among joint venturers"). Both Rhode Island and Massachusetts have adopted § 12 of the Uniform Partnership Act which states that absent fraud on the partnership, the knowledge of one partner related to partnership affairs is imputable to the partnership and the members thereof. R.I.Gen.Laws § 7–12–23; Mass.Gen.Laws ch. 108A § 12. As a joint venture is a form of partnership subject to the laws governing partnerships, the rule

of § 12 is applicable to joint venturers. Thus, knowledge of one joint venturer related to the affairs of the joint venture is imputable to his or her cohorts absent fraud by the knowledgeable party on his or her fellow joint venturers. *Cf. McAleer v. Smith*, 728 F.Supp. at 861 (holding the conduct of one joint venturer may be imputed to his or her cohorts for jurisdiction purposes, because mutual agency exists between joint venturers in the same manner as between partners).

In the present case, with the corporate veil of Universal pierced, Munoz and Lampert are co-owners in the entity they organized to design and produce Fueltrack. (Munoz Depo. at 15.) Joyal views himself as a "possible partner" in Universal who invested his time and "sweat equity" into the company and in return is entitled to a share in the profits. (Joyal Depo., Pl.'s Ex. 16 at 226–27.) Backman also sees himself as having an ownership interest in Universal, resulting from his investment of time and "sweat equity." (Backman Depo., Pl.'s Ex. 19 at 42–47.) These statements create a material question of fact as to whether the defendants are joint venturers. If a joint venture is found to be present here by the trier of fact, then Joyal and Desilets' knowledge of the D and D Agreement is imputable to the other defendants, satisfying the knowledge element of plaintiff's intentional interference with contract claim. Consequently, the defendants' motion for summary judgment on Count IV should be denied.

Plaintiff raises a second issue of fact regarding Munoz, Lampert and Backman's knowledge of the D and D Agreement. Munoz states by affidavit that he was not aware of the D and D Agreement until October of 1993. (Munoz Aff., Defs.' Ex. G ¶ 3.) In his deposition he acknowledged that at some time during the association of Universal and Joyal and Desilets, Universal was informed of an existing agreement between Joyal and Desilets and Scully, but he could not recall when that occurred. (Munoz Depo. at 72.)

2. Munoz and Lampert are the sole shareholders of Universal and have invested no capital into the company. (Munoz Depo. at 15–16.) Universal has no bank account and all its operating expenses are paid by Caribbean Motors of which Munoz is vice president and Lampert president. *Id.* at 8, 16. Universal also has no board of directors, directors meetings, shareholders meetings or corporate minutes. *Id.* at 16.

He later testified that he had no knowledge of the D and D Agreement until he received a copy of it from Joyal sometime after December 22, 1993. *Id.* at 73–75. Joyal testified that he did not recall when he told Munoz of the D and D Agreement or whether he provided Munoz with a copy of the D and D Agreement. (Joyal Depo., Defs.' Ex. I at 210–11.) Desilets testified at his deposition that he felt constrained by the D and D Agreement in that "it wouldn't be right for [him] to take what [he and Joyal] had done for Scully and use that for [his] own benefit...." (Desilets Depo., Pl.'s Ex. 12 at 77.) He also testified over objection that he thought that this constraint would have been something that Munoz should know about in embarking on Fueltrack and that he may have informed Munoz about the constraints of the D and D Agreement as early as the Spring of 1992, but could not recall exactly and therefore did not want to state when it was. *Id.* at 78. Munoz testified that he did not recall speaking to Desilets regarding the D and D Agreement prior to seeing it after December 22, 1993. (Munoz Depo. at 78, 85.)

It cannot be said that this testimony amounts to a glaring conflict in facts presented by both sides such that there is a clear and unmistakable genuine dispute. Nevertheless, the facts determinative of when Munoz may have been informed as to the existence of the D and D Agreement are solely within the control of the defendants. The plaintiff is therefore hard pressed to put forth a piece of evidence in diametric opposition to Munoz's contentions and is left with attempting to point out enough of a conflict in the defendants' assertions to create a question as to the veracity of Munoz's statements that must be resolved at trial. Plaintiff may not accomplish this by merely resting on the allegations or denials of its pleadings, but such is not the case here. The testimony of Munoz and Desilets conflicts enough so that the trier of fact is presented with a choice between the parties differing versions of the truth that it could resolve in favor of plaintiff. Thus, the defendants' motion for summary judgment should be denied as to Count IV.

**D. Counts V and VI—Unfair and Deceptive Business Practices against Joyal and Desilets and Universal Control, Munoz, Lampert and Backman respectively**

■ Defendants' motions for summary judgment on Counts V and VI of the Second Amended Complaint should be granted but without prejudice to plaintiff asserting common law claims for unfair competition. In Counts V and VI, plaintiff brings claims of unfair competition and deceptive business practices pursuant to Mass.Gen.Laws ch. 93A which provides a private right of action to any business person who suffers a loss as a result of another business person's use of an unfair method of competition or an unfair or deceptive act. Mass.Gen.Laws ch. 93A § 11. Defendants contend that Massachusetts law is inapplicable and instead, Rhode Island's Deceptive Trade Practices Act, R.I.Gen.Laws § 6–13.1–1 et seq., applies. The Rhode Island Act only provides private rights of action to the Attorney General and to "person[s] who purchase or lease goods or services primarily for personal, family, or household purposes...." R.I.Gen.Laws §§ 6–13.1–5, 6–13.1–5.2. Thus, as Scully is a corporation and consequently does not fit into either class of litigants the statute provides causes of action for, it does not have standing to assert a claim under the act. *See Schroeder v. Lotito,* 577 F.Supp. 708, 717 (D.R.I. 1983) (dismissing plaintiffs' claims pursuant to R.I.Gen.Laws § 6–13.1–1 et seq., because individual plaintiff suing in his official capacity as a union member and officer and his union were not within the class of persons permitted to prosecute private actions under the act); *R.I. Depositors Economic Protection Corp. v. Hayes,* 1994 WL 62165 at *5 (D.Mass.1994) (holding R.I.Gen.Laws § 6–13.1–1 et seq., "unlike [Mass.Gen.Laws ch. 93A], does not include within its scope business people injured in the course of business"). Thus, there is a conflict between the applicable law of these two states that must be resolved.

■ A federal court sitting in diversity must apply the law of the forum state, *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), including that

state's conflict of law rules, *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Thus, Rhode Island's conflict of law rules govern here, but I must first determine the nature of plaintiff's claims in order to apply the appropriate conflict of law rule.

■ Claims made pursuant to Mass.Gen. Laws ch. 93A may be treated as tort or contract claims for choice of law purposes, depending on the nature of the claims. *See Crellin Technologies, Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 11–12 (1st Cir.1994) (treating plaintiff's chapter 93A claim as a tort for choice of law purposes); *Northeast Data Systems, Inc. v. McDonnell Douglas Computer Systems Co.*, 986 F.2d 607, 609–10 (1st Cir.1993) (treating plaintiff's 93A claims as breach of contract claims for choice of law purposes). The facts underlying the claim and the conduct complained of are the relevant factors in determining if the claim is most analogous to a tort or contract claim. *Crellin Technologies*, 18 F.3d at 12; *Northeast Data*, 986 F.2d at 610.

■ Here, Count V is clearly most analogous to a claim that Joyal and Desilets wrongfully breached the D and D Agreement with Scully. Allegations within a chapter 93A claim as to the defendants' state of mind or bad motive in breaching a contract do not take such claims outside of the scope of contractual claims. *Northeast Data*, 986 F.2d at 609. Count V alleges that Joyal and Desilets willfully and intentionally violated Mass.Gen.Laws ch. 93A, because they "are using and will continue to use Scully's trade secrets and confidential proprietary information in part for the purpose of offering potential customers a 'cloned' computerized fuel management system...." (Second Amended Complaint ¶¶ 74, 76.) The D and D Agreement clearly prohibited Joyal and Desilets from retaining any material relating to the Prodigy Project or from divulging to anyone or using for their own or another's benefit, any information embodied in the Prodigy system unless duly authorized in writing by Scully. (Defs.' Ex. F at 500533–34.) Plaintiff's allegations in Count V allege a breach of this prohibition of the D and D Agreement and thus should be considered as

breach of contract claims for choice of law purposes. This conclusion is made certain when the allegations in Count V are compared to those in Count III, plaintiff's breach of contract claim against Joyal and Desilets. Similar to Count V, Count III alleges that Joyal and Desilets are liable to Scully because they used secret or confidential information of Scully embodied in the Prodigy system. This, plaintiff alleges, amounts to a breach of the D and D agreement. (Second Amended Complaint ¶ 64.) Certainly, Count III would be treated as a contractual claim for choice of law purposes and likewise so should Count V.

■ A choice of law provision in an agreement also governs claims made pursuant to Mass.Gen.Laws ch. 93A that the agreement was breached as long as the forum state's conflict of law rules will enforce that choice of law provisions. *Northeast Data*, 986 F.2d at 610. Under Rhode Island law, "parties to a contract may stipulate to have their contract interpreted by the law of a specific state, if that state bears some real relationship to the contract, and if the law of the chosen state is not contrary to the public policy of the forum state." *Providence & Worcester Railroad Company v. Sargent & Greenleaf*, 802 F.Supp. 680, 684 (D.R.I.1992). The D and D Agreement states: "This Agreement shall be governed by the laws of the Commonwealth of Massachusetts without giving effect to principles of conflict of law." (Defs.' Ex. F at 500534.)

■ Without question, Massachusetts has a real relationship to the D and D Agreement. Joyal and Desilets contracted in the D and D Agreement to develop and deliver Prodigy to Scully, a Massachusetts company, and thereafter to assist Scully in Massachusetts to test and produce Prodigy as a saleable product. Also, it is not contrary to Rhode Island policy to permit Scully to sue Joyal and Desilets under Mass.Gen.Laws ch. 93A for breaching the D and D agreement. Rhode Island law certainly would allow a corporation to sue these independent contractors for breach of contract. Moreover, the fact that Rhode Island law does not allow this action to be brought pursuant to its own

Deceptive Trade Practices Act, R.I.Gen.Laws § 6–13.1–1 et seq., is no indication that it is contrary to Rhode Island policy for other states to allow such actions. In fact, in *Eastern Motor Inns, Inc. v. Ricci*, 565 A.2d 1265, 1274 (R.I.1989), the Rhode Island Supreme Court applied Mass.Gen.Laws ch. 93A in deciding a claim of deceptive business practices between business persons and a corporation. Presumably, the court would not have done so if chapter 93A was contrary to Rhode Island public policy. Therefore, Massachusetts law governs plaintiff's claims in Count V.

The parties dispute as to whether plaintiff has properly established that Joyal and Desilets' conduct attained the level of rascality required to assert a claim pursuant to Mass. Gen.Laws ch. 93A § 11. I need not reach this question however, because Count V fails to satisfy another required element of ch. 93A § 11. No claim is actionable under that section unless the "transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within [Massachusetts]." Mass.Gen.Laws ch. 93A § 11. In *Clinton Hospital Association v. Corson Group, Inc.*, 907 F.2d 1260, (1st Cir. 1990), the United States Court of Appeals for the First Circuit, in considering whether statements alleged to be actionable under chapter 93A occurred "primarily and substantially" in Massachusetts, considered a number of factors gleaned from Massachusetts case law. Those factors are: (1) "where the defendant committed the deceptive or unfair acts or practices;" (2) where the plaintiff received and acted upon the deceptive or unfair statements or acts; and (3) "the situs of plaintiff's losses due to the unfair or deceptive acts or practices." *Id.* at 1262–66. The court noted that other factors may be considered and that the analysis should be functional and pragmatic, particularly where the factors are more complex. *Id.* at 1267.

The starting point to this analysis is to determine what conduct is complained of. As stated above, Count V alleges that Joyal and Desilets violated chapter 93A by using Scully's trade secrets and confidential infor-

mation to offer potential customers a computerized fuel management system that was cloned from Scully's Prodigy system. (Second Amended Complaint ¶ 74.) As this matter surrounds Joyal and Desilets work on the Fueltrack system for Universal, it is reasonable to interpret Count V as complaining of Joyal and Desilets' improper use of Scully information in creating Fueltrack. The parties did not address where Joyal and Desilets worked on Fueltrack for Universal, and frankly, the record is sparse on this point. Nevertheless, the only evidence in the record to date as to where this work took place is Munoz's deposition testimony that Joyal and Desilets worked on Fueltrack at their homes located in Rhode Island. (Munoz Depo. at 66.) With nothing in the record disputing this fact, I must conclude that the deceptive practices complained of in Count V occurred in Rhode Island and not Massachusetts. This dearth of alleged improper conduct in Massachusetts would on its face appear to warrant dismissal of Count V, and neither of the other two *Clinton* factors change this conclusion.

The second factor, where the plaintiff received and acted upon the deceptive or unfair statements or acts, is not relevant to this case. As was the case in *Clinton*, this factor would be most suited to a situation where the defendant had made some sort of deceptive or fraudulent representation to the plaintiff. Such is not the case here. In Count V, Joyal and Desilets are accused of using Scully's confidential and proprietary information in developing Universal's Fueltrack, and it is not alleged that Scully received some representation from defendants that amounted to a deceptive act under chapter 93A.

Likewise, the third factor, the situs of the plaintiff's loss, is non-determinative in this case. In cases like the present one, where plaintiffs complain of misappropriation of trade secrets or proprietary information, the injury suffered is loss of customers by the plaintiff or an unfair profit obtained by the defendant which more often than not occurs in two or more states. The effect of this loss will certainly be felt at the plaintiff's headquarters or principal place of business but is undeniably connected with other states as

well. Moreover, it may have little or no connection with the location of the wrongful conduct. Thus, it is a factor with little significance here and is outweighed by the location of Joyal and Desilets alleged wrongful conduct in Rhode Island. *See Default Proof Credit Card System v. State Street Bank & Trust Co.*, 753 F.Supp. 1566, 1570 n. 3 (S.D.Fla.1990) (quoting Restatement (Second) of Conflict of Laws § 145 cmts. c, f, and making similar observations in the conflicts of law arena); *Bates v. Cook, Inc.*, 615 F.Supp. 662, 677 (M.D.Fla.1984) (same). Therefore, the conduct of Joyal and Desilets that plaintiff alleges as actionable under Mass.Gen.Laws ch. 93A § 11 cannot be found to have occurred "primarily and substantially" in Massachusetts. Consequently, Joyal and Desilets should be granted summary judgment on Scully's statutory unfair competition claims in Count V without prejudice to Scully bringing similar claims pursuant to Massachusetts common law hereafter.[3]

■ Count VI alleges that Universal, Munoz, Lampert and Backman have violated Mass.Gen.Laws ch. 93A § 11 using "Scully's trade secrets and confidential proprietary information" to produce a "cloned" computerized fuel management system. (Second Amended Complaint ¶¶ 79–80.) Clearly, under the reasoning in *Crellin Technologies, Inc. v. Equipmentlease Corp.*, 18 F.3d 1, and *Northeast Data Systems, Inc. v. McDonnell Douglas Computer Systems Co.*, 986 F.2d 607, outlined above, Count VI should be treated as a tort claim for conflict of law purposes. There was no contract between Scully and any of these parties, and thus, plaintiff's chapter 93A claims in Count VI cannot be considered related to any contract and are most analogous to the tortious claim of unfair competition. *See id.*

■ The Rhode Island Supreme Court has adopted the interest weighing analysis found in the Restatement (Second) of Conflict of Laws for choosing between the conflicting tort law of two or more states. *See Woodward v. Stewart*, 104 R.I. 290, 243 A.2d 917 *cert. dismissed sub nom, Vizcarra-Delgadillo v. U.S.*, 393 U.S. 957, 89 S.Ct. 387, 21 L.Ed.2d 371 (1968); *Brown v. Church of the Holy Name of Jesus*, 105 R.I. 322, 252 A.2d 176 (1969). In the context of unfair competition claims, the place of the defendants' conduct is the overriding factor to be considered. *Default Proof Credit Card System v. State Street Bank*, 753 F.Supp. at 1570 (quoting Restatement (Second) of Conflicts of Law § 145 cmts. e, f); *Bates v. Cook, Inc.*, 615 F.Supp. at 677 (same). This is particularly true here where Mass.Gen.Laws ch. 93A § 11 requires the defendants' conduct to be "primarily and substantially" in Massachusetts in order to be actionable under the statute. *Clinton Hospital Association v. Corson Group, Inc.*, 907 F.2d at 1264. This rule "represents a legislative determination that G.L. c. 93A should not apply to certain transactions and actions that do not occur principally and significantly in Massachusetts." *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662, 671 (1985).

■ In a misappropriation of trade secrets case such as the present one, the defendants' wrongful conduct is said to take place where the defendants misused the plaintiff's confidential information for their own benefit. *Default Proof Credit*, 753 F.Supp. at 1571; *Bates*, 615 F.Supp. at 676. As found above, Joyal and Desilets allegedly misused Scully's proprietary information to create the Fueltrack system for Universal (and Munoz, Lampert and Backman with Universal's corporate veil pierced) in Rhode Island. Therefore, Rhode Island is the location of Universal, Munoz, Lampert and Backman's wrongful conduct, and it is Rhode Is-

---

3. In responding to the defendants argument that R.I.Gen.Laws § 6–13.1–1 applies to Scully's unfair competition claims, thereby preventing Scully from asserting statutory unfair competition claims, Scully argues that if the Court found the Rhode Island statute so applied, it should be allowed to pursue an unfair competition claim pursuant to Rhode Island common law. *See Schroeder v. Lotito*, 577 F.Supp. at 717 n. 4.

Scully made no such claim in its Second Amended Complaint and cites no case law setting forth the elements of such a claim under the common law of Massachusetts or Rhode Island. Therefore, it is most appropriate to dismiss its unfair competition claims as they now stand and allow Scully the opportunity to bring properly supported common law claims hereafter.

land law that applies to Scully's resulting claims in Count VI.

█ As set forth above, R.I.Gen.Laws § 6–13.1–1 et seq. does not provide a private right of action for business persons or entities. *See Schroeder v. Lotito,* 577 F.Supp. at 717; *R.I. Depositors Economic Protection Corp. v. Hayes,* 1994 WL 62165 at *5. Scully does not contend that it falls within one of the classes permitted to bring a private action under the Rhode Island statute. Instead, as noted above, *supra* note 3, it argues that it should be allowed to press an unfair competition claim pursuant to Rhode Island common law. I found above that no such claim was set forth in the Second Amended Complaint. Thus, Universal, Munoz, Lampert and Backman should be granted summary judgment on Scully's statutory unfair competition claims in Count VI without prejudice to Scully bringing a similar claim under the common law of Rhode Island.

### E. Count VII—Unjust Enrichment against Universal Control, Munoz, Lampert and Backman

█ The defendants should be granted summary judgment on Count VII of the Second Amended Complaint. Count VII alleges that Universal, Munoz, Lampert and Backman unjustly benefitted monetarily by misappropriating Scully's proprietary technology in developing the Fueltrack system. A necessary element to a claim of unjust enrichment is that the plaintiff had a reasonable expectation of payment from the defendants. *Commercial Associates v. Tilcon Gammino, Inc.,* 998 F.2d 1092, 1100–01 (1st Cir.1993) (applying Rhode Island law); *Bolen v. Paragon Plastics, Inc,* 747 F.Supp. 103, 107 (D.Mass.1990) (applying Massachusetts law); *R & B Electric Co., Inc. v. Amco Construction Co., Inc.,* 471 A.2d 1351, 1356 (R.I.1984) (finding no promise by defendants to pay plaintiff); *GSGSB, Inc. v. New York Yankees,* 862 F.Supp. 1160, 1171 (S.D.N.Y. 1994) (applying New York law). Nowhere in the record is there any indication that Scully expected any form of payment from Universal, Munoz, Lampert and Backman for use of its proprietary information and trade secrets. In fact, Scully contends that such use was

without its knowledge. Therefore, the record does not support a claim of unjust enrichment against Universal, Munoz, Lampert and Backman, and they should be granted summary judgment on Count VII.

### F. Count VIII—Breach of Agreement to Use "Best Efforts" and Breach of Duty Against Joyal and Desilets

█ Joyal and Desilets' motion for summary judgment on Count VIII of the Second Amended Complaint should be denied. That count alleges that Joyal and Desilets breached their duty to use best efforts in performing under the D and D Agreement. (Second Amended Complaint ¶¶ 89–93.) Under the D and D Agreement, Joyal and Desilets agreed to complete their work on Prodigy "in a professional fashion in accordance with the best engineering standards," *id.* at 500527, and to "use their best efforts" to complete the Prodigy system through the stage of engineering prototype, *id.* at 500528. The D and D agreement also states that

> [Joyal and Desilets] agree[ ] to assign all … right, title and interest in all inventions, discoveries, products, processes and computer programs which [have been] conceived or developed in connection with the Work … to Scully….

> \* \* \* \* \* \*

> [Joyal and Desilets] agree[ ] that, upon completion of the Work, [they] will promptly deliver to Scully any papers, drawings, blueprints, manuals, letters, notes, notebooks, reports, diskettes or other machine-readable media or other material relating to the Prodigy Project which are or in the future will be in [their] possession or under [their] control.

> Neither of the Engineers shall, either during or after completion of the Work divulge to anyone or use for his own or another's benefit, any information (including designs, specifications, and software programs) embodied in the Prodigy system unless duly authorized in writing by an officer of [Scully].

*Id.* at 500533–34. The agreement further provided that Joyal and Desilets would furnish Scully with a list of all modifications that

needed to be made to Prodigy and provide on the job training to Scully's engineers relating to the technology, manufacturing, assembly and testing of Prodigy. *Id.* at 500542. The D and D Agreement also states: "This Agreement shall be governed by the laws of the Commonwealth of Massachusetts without effect to the principles of conflicts of law." *Id.* at 500534. "Under Massachusetts law, every contract contains an impled covenant of good faith and fair dealing, providing that neither party will do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *F.D.I.C. v. Villemaire,* 849 F.Supp. 116, 120 (D.Mass.1994) (citing *Anthony's Pier Four, Inc. v. HBC Associates,* 411 Mass. 451, 583 N.E.2d 806, 820–21 (1991)).

There is ample evidence in the record that Joyal and Desilets breached their obligations and duties under the D and D Agreement. Joyal and Desilets contend that all the work under the D and D Agreement was completed in January of 1992 and that a prototype was successfully demonstrated to Scully as per the D and D Agreement in February, 1992. (Joyal Depo., Pl.'s Ex. 10 at 141; Joyal Aff., Defs.' Ex. A ¶¶ 6–7; Desilets Aff., Defs.' Ex. C ¶¶ 6–7.) Joyal testified at his deposition that in January of 1992, when he and Desilets turned over Prodigy to Scully, the system was functioning and that he never formed a belief that a complete redesign of Prodigy would have been in order. (Joyal Depo., Defs.' Ex. B at 159.) Nevertheless, Joyal testified previously in the same deposition that as of February, 1992, he felt that a complete redesign of Prodigy was in order to prevent the system from being outdated. (Joyal Depo., Pl.'s Ex. 10 at 153–54.) Further, Joyal did not discuss any of the perceived disadvantages of the Prodigy system with Scully engineers. (Joyal Depo., Pl.'s Ex. 16 at 23.)

Plaintiff disputes that Joyal and Desilets successfully completed their work for Scully in February of 1992. Scully submits a letter from Desilets to a Scully employee dated September 13, 1992 which references computer disks with design information that Desilets was returning to Scully with the letter and states: "This should bring to a close this one remaining issue left open under the Design and Development Agreement." (Pl.'s Ex. 9.) Scully's president, testified by affidavit that the February 22, 1992 testing of Prodigy was not wholly successful and that the system did not appear to function until Joyal and Desilets succeeded in "jury-rigging" it to perform. (Scully Aff., Pl.'s Ex. 1, ¶ 7.) Further, Scully engineers contacted Joyal and Desilets by mail and phone through October, 1992 to get Joyal and Desilets to provide the training and instruction on Prodigy, to disclose confidential information, including source codes, and to provide the necessary documentation and models, all of which was agreed upon in the D and D Agreement. *Id.* ¶ 9.

Joyal and Desilets also contend that they never divulged any proprietary or confidential information from the Prodigy project to anyone at Universal, that in developing Fueltrack they did not use any of the drawings, proprietary information or data that they had developed or had access to working on Prodigy and that Fueltrack's design, specifications and software programs are completely different from Prodigy. (Joyal Aff., Defs.' Ex. A ¶¶ 10–12; Desilets Aff., Defs.' Ex. C ¶¶ 10–12.) Desilets testified that he retained some general knowledge, information and source codes on computer disk from his work with Scully (Desilets' Depo., Pl.'s Ex. 12 at 86, 90), and some of these source may have been incorporated into the source code for Universal's Fueltrack system, *id.* at 89. Further, John S. Mark, a software developer and consultant, testified by affidavit on Scully's behalf that "substantial portions of FUELTRACK software must have been produced either directly (i.e. verbatim copying) or indirectly (i.e. utilizing the same functionality and design) from PRODIGY software, and that the design and implementation of the PRODIGY software formed the basis for the FUELTRACK software." (Mark Aff., Pl.'s Ex. 2 ¶ 24.) Certainly, this evidence presents numerous questions of fact on the issue of Joyal and Desilets' breach of their obligations under the D and D Agreement and their corresponding duties of good faith and fair dealing. Accordingly, their motion for

summary judgment on Count VIII should be denied.

### Conclusion

For the reasons stated, I recommend that Munoz, Lampert and Backman's motion to dismiss be denied and defendants' motion for partial summary judgment be granted as to Count VII, granted as to Counts V and VI without prejudice to plaintiff bringing common law claims as described *supra* part II.D. and denied as to Counts IV and VIII of the Second Amended Complaint.

 Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. Local Rule of Court 32; Fed.R.Civ.P. 72(b). Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the district court. *United States v. Valencia–Copete*, 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir.1980).

February 6, 1995.