Northern Laminate v. Matthews          CV-02-251-JM  03/07/03  P

**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF NEW HAMPSHIRE**


<u>Northern Laminate Sales, Inc.</u>

   v.                                    Civil No. 02-251-JM
                                        Opinion No. 2003 DNH 032
<u>James F. Matthews</u>


## O R D E R

In its Complaint, the Plaintiff, Northern Laminate Sales, Inc. ("NLS"), alleges that the Defendant, James F. Matthews, violated provisions of N.H. RSA 545-A, the Uniform Fraudulent Transfer Act, and N.H. RSA 358-A:1, <u>et</u> <u>seq.</u>, which prohibits unfair or deceptive acts or practices.  Among the forms of relief sought, Plaintiff asks the Court to pierce the corporate veils of American Board Companies, Inc. ("ABC") and Matco Electronics Group, Inc. ("Matco") to render Matthews personally liable for $244,040.64, an amount that ABC owes Plaintiff pursuant to a settlement agreement executed at the conclusion of a prior litigation in this Court.  Before the Court for consideration is Defendant's Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Rule 12(b)(2) and to Dismiss Plaintiff's RSA 358-A Claim Pursuant to Rule 12(b)(6).  For the reasons set for herein, Defendant's motion to dismiss is granted because the Court finds

that it does not have personal jurisdiction over Matthews.

STANDARD OF REVIEW

Since the Defendant has contested this Court's personal jurisdiction over him, the Court must determine whether the Plaintiff has shown that sufficient facts exist to support the Court's exercise of jurisdiction over the Defendant under the New Hampshire long-arm statute and the Due Process Clause of the Fourteenth Amendment to the Constitution.  See Lyle Richards Int'l, Ltd. v. Ashworth, Inc, 132 F.3d 111, 112 (1st Cir. 1997); Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995); Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 204 (1st Cir. 1994).  In ruling on a motion to dismiss under Rule 12(b)(2), the court need not hold an evidentiary hearing to determine the jurisdictional facts.  Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 45 (1st Cir. 2002); Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145 (1st Cir. 1995); Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675-676 (1st Cir. 1992).  I accept the Plaintiff's evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing.  See Daynard, 290 F.3d at 45.  Accordingly, I draw the facts from the pleadings and

filings, including affidavits, taking the facts affirmatively alleged by the Plaintiff as true and construing disputed facts in the light most hospitable to the Plaintiff. Lyle Richards, 132 F.3d at 112 n.1. I do not, however, credit conclusory allegations or draw farfetched inferences. See Ticketmaster-New York, 26 F.3d at 203. I also consider the facts alleged by Defendant to the extent that they are uncontradicted. Daynard, 290 F.3d at 51. Applying this standard, the factual background is set forth in the next section.

BACKGROUND

## I. Relevant Parties

NLS is incorporated in the State of New Hampshire with a principal place of business in Atkinson, New Hampshire. It furnishes laminate components for printed circuit boards. Matthews is an individual who resides in Binghamton, New York. At all relevant times, Matthews was an officer, director and the sole and controlling shareholder of ABC and Matco. ABC was incorporated in the State of New York in 1987. Matco, an electronics manufacturer, was incorporated in the State of Delaware in 1996. Plaintiff alleges that Matco operated in combination with a number of affiliates, including ABC, and that

3

Matco exercised control over those affiliates.[1]

II.  Plaintiff's Relationship with ABC and Matco

Plaintiff contracted with ABC for the sale of laminate components.  Plaintiff alleges that during the year 2000, ABC placed hundreds of orders for products to be shipped F.O.B. NLS's Atkinson, New Hampshire Facility.[2]  By letter dated September 1, 2000, Miles Russell, NLS's President, wrote to Matthews expressing concern about the lack of timely and regular payments for product that NLS shipped to ABC.  See App. to NLS's Verified Objection to Mot. to Dismiss ("App.") at Tab 6.  Plaintiff sent a copy of that letter to Larry Davis ("Davis"), Secretary and Treasurer of ABC and Matco.

Plaintiff alleges that Matthews delegated the responsibility for responding to the September 1st letter to Davis.  In a

---

[1]Plaintiff alleges that Matco operated in combination with the following affiliates: ABC, U.S. Assemblies Hallstead, Inc., Carolina Assemblies, Inc., U.S. Assemblies Endicott, Inc., U.S. Assemblies Raleigh, Inc., U.S. Assemblies RTP, Inc., U.S. Assemblies in Florida, Inc., Matco Precision, Inc., U.S. Assemblies San Diego, Inc., Visara, Inc., Eagle Technologies, Inc., U.S. Assemblies New England, Inc., and U.S. Assemblies Georgia, Inc.  With the exception of ABC, all of these affiliates were wholly-owned subsidiaries of Matco.  See Compl. at ¶ 6.

[2]The term "F.O.B." is an abbreviation for "free on board" and means that the seller will deliver subject matter contracted for, on certain conveyance, without expense to buyer.  Black's Law Dictionary 665 (16th ed. 1990).

4

deposition held after the instant lawsuit was filed, Matthews testified that he had no recollection of ever receiving the September 1st letter.[3] App. at Tab 15, pp. 29-30. Both Matthews and Davis testified, however, that Matthews delegated the responsibility for handling matters such as those set forth in Russell's September 1, 2000 letter to Davis. See App. at Tab 1, pp. 143-145, and Tab 15, pp. 29-30. Davis testified that he did not discuss the letter with Matthews, and that he took it upon himself to respond. App. at Tab 1, pp. 143-144.

On September 14, 2000, Russell met with Davis in Vestal, New York to discuss Plaintiff's concerns. Plaintiff alleges that Davis made the following representations at that meeting: (1) Matco was committed to supporting ABC; (2) Matco would guaranty ABC's payment obligations; (3) ABC's payment delinquencies were not cash-flow related, but rather were occasioned by logistical problems; (4) Matco and its affiliates, on a consolidated basis, were profitable; (5) Matco and its affiliates, on a consolidated basis, were in a good financial position; (6) Matco and its affiliates, on a consolidated basis, were growing rapidly; (7) Davis would provide consolidated financial statements to NLS

---

[3]Matthews and Davis testified at depositions held on September 13, 2002 by agreement between the parties.

5

within a few weeks of the meeting.  See Compl. at ¶ 12-13, Verified Objection to Def.'s Mot. to Dismiss ("Objection") at 3-4, and App. at Tab 7.  During his deposition, Davis denied having made any of the foregoing representations with the exception of stating that Matco was committed to supporting ABC, and that he would provide financial statements to NLS.  App. at Tab 15, pp. 161-163.  Davis admits that he did not send NLS any financial statements.  In a letter to Russell dated September 22, 2000, Davis wrote:

> I enjoyed meeting with you last week and I feel that NLS and ABC can continue a mutually successful partnership.  This letter serves as my commitment to meet your payment terms and I have instructed our staff to remit to you each Friday payment for all invoices 53 days and older.  Also I assure you that the Matco Electronics Group, Inc. stands behind this commitment and all confirmed obligations of ABC to NLS.
>
> As I mentioned if there is ever an issue with payment, simply send me an e-mail . . . .

App. at Tab 8.

Plaintiff contends that Davis willfully concealed and misrepresented Matco's and ABC's financial condition from September 14, 2000 on for the purpose of inducing Plaintiff to extend unwarranted credit to Plaintiff's detriment.  According to Plaintiff, contrary to Davis' representation, Matco and its

affiliates, on a consolidated basis, were not profitable. On a consolidated basis, Matco and its affiliates lost $29,877,669 in the year 2000. See App. at Tabs 3-4 (Exhibits 3, 11 to Davis' Deposition).[4] During 1999, Matco and its affiliates lost $9,652,115. Id. Contrary to Davis' alleged representation, Matco and its affiliates, on a consolidated basis, were not in a good financial position. Id. Rather, Matco's and its affiliates' then current liabilities vastly exceeded their then current assets during the years 1999 and 2000. Id. In 1999, the liabilities of Matco and its affiliates were $155,688,503 while its assets were $138,718,302. Id. In 2000, the liabilities of Matco and its affiliates were $104,247,445 while its assets were $81,088,211. Id. Contrary to Davis' alleged representation, Matco and its affiliates, on a consolidated basis, were not rapidly growing, but rather were in decline. Id. Plaintiff alleges that Davis made each representation with knowledge of its falsity or with conscious indifference to its truth. And

_____

[4]Throughout the Complaint and Objection, Plaintiff refers to the financial condition of Matco and its affiliates "reporting on a consolidated basis." Davis testified at his deposition that the documents attached at Appendix Tabs 3-4 are consolidated balanced sheets that were prepared for the purpose of obtaining replacement financing for Matco and its affiliates. App. at Tab 1, p. 71-72, 117.

Plaintiff alleges that it reasonably and justifiably relied upon Davis' representations to its detriment. Between the September 14, 2000 meeting between Davis and Russell and November 2, 2000, ABC's total indebtedness to Plaintiff grew from $337,445.60 to $669,941.47.

On October 31, 2000, Russell sent an e-mail to Davis in which he wrote:

> During our [September 14th] meeting you had asked me to Email you anytime we had problems with payments.
>
> Currently, we have not seen a check in three weeks and the last check we did receive has been returned to [NLS] with a 'return to maker' marking (our agreement calls for a weekly check paying all invoices 53 days old or older).
>
> Currently $215,717.57 is due through next Monday, including the amount of the check that has been returned.
>
> Your [Accounts Payable] staff has indicated that Matco has encountered a problem with your [Line of Credit] facility and that this problem should be cleared up by the end of the week.
>
> I would appreciate an update on this situation.
>
> Also, Larry, I have not yet received the financial statements that you agreed to forward following our [September 14th] meeting.

Compl. ¶ 17. On November 1, 2000, Davis sent a reply to Russell's e-mail:

I apologize for not responding sooner. About two weeks ago, our Bank Group disallowed a substantial receivable, which backed us into an overadvance. They began returning checks and to date have only allowed us to fund payroll. We are working very hard to correct this situation through difficult circumstances. We are working with a consulting group to get our banking relationship back on track. We will try to keep you informed as to the availability of funding and payments. I assure you this situation was totally unexpected and we are doing everything posible (sic) to protect our suppliers.

Compl. at ¶ 18. On November 10, 2000, Russell sent another e-mail to Davis in which he stated: "You've ignored numerous telephone calls. I would appreciate an update on Matco's situation positive or negative." Id. at ¶ 19. Davis replied to Russell's November 10th e-mail on November 11, 2000:

I have not been intentionally ignoring your calls. I have been working diligently on solutions. We have a consulting team now involved and our focus has been on our options, including equity, refinancing etc. We will be presenting a cash plan to our current bank group next week. Hopefully they will free up advances to our vendors. Again, we are trying to do all posible (sic) to protect our supplier/partners exposure.

Id. at ¶ 20.

III. Prior Litigation

NLS subsequently filed a lawsuit against Matco in New Hampshire state court. Matco removed the action to this Court on

December 8, 2000.[5] Matthews was not named as a defendant in that action. On February 16, 2001, the parties entered into a Stipulation for Judgment, which was endorsed by the Court (Barbadoro, C.J.) on February 20, 2001. The relevant terms of that stipulation are as follows:

> Pursuant to Fed. R. Civ. P. 41(a)(1)(i), Northern Laminate Sales, Inc. ("NLS") gives notice of dismissal of this action, without prejudice, as to each of the named Trustee Defendants. American Board Companies, Inc. ("ABC"), an affiliate of Matco Electronics Group, Inc. ("Matco"), is added as a party defendant. [Counsel] appears on behalf of ABC. This case is dismissed, without prejudice, as to Matco only. Judgment is entered in favor of NLS and against ABC in the sum of $669,946.46, plus interest from November 9, 2000 until December 31, 2000 . . . . The Court shall retain jurisdiction to enforce this judgment and the terms of the parties' contemporaneously executed "Settlement Agreement and General Release of All Claims."

Compl. at ¶ 23. The settlement agreement referenced in the Stipulation for Judgment required ABC to pay NLS $100,000 on or before April 20, 2001. Compl. at ¶ 24. ABC was then required to pay NLS $50,000 on or before June 1, 2001, and "an equal sum of money on or before the 1st day of each month thereafter until the entire judgment amount, including interest, costs and [NLS's] attorney's fees, is fully satisfied." Id. ABC paid NLS as

_____

[5]See Northern Laminate Sales, Inc. v. Matco Electronics Group, Inc. et al., Civil Action No. 00-CV-573-B.

10

required under the settlement agreement from April 1, 2001 through November 1, 2001, but ceased making payments thereafter.

NLS commenced a second lawsuit against Matco in this Court on January 9, 2002.[6] Matthews was not named as a defendant in that action. Matco failed to plead or otherwise defend the second action as provided by the Federal Rules of Civil Procedure. Pursuant to Fed. R. Civ. P. 55(a), the Clerk of Court entered a default as to Matco and set a damages hearing for March 29, 2002. Prior to the hearing, on February 13, 2002, other Matco creditors filed an involuntary bankruptcy petition against Matco in the United States Bankruptcy Court for the Northern District of New York.[7] Compl. at ¶ 27. On March 21, 2002, the civil action in this Court was stayed and closed subject to being reopened upon request of either party.

Plaintiff alleges that its efforts to collect any of the remaining money due to NLS from Matco have proved fruitless. Compl. at ¶ 27. Plaintiff further alleges that representatives of ABC have declared that ABC cannot pay the remaining $244,040.64 owed to NLS. Id. Plaintiff was informed that ABC

---

[6]See Northern Laminate Sales, Inc. v. Matco Electronics Group, Inc., Civil Action No. 02-CV-8-JD.

[7]See In re Matco Electronics Group, Inc., No. 02-60835.

11

has ceased operations and that a bankruptcy filing is imminent.
Id.

IV.  Additional Facts Alleged In Support of Fraudulent Transfer
     and Veil Piercing Theories

Plaintiff alleges in its Complaint that it has suffered damages because Matco systematically diverted money from ABC for the ultimate benefit of Matthews.  Compl. at ¶ 14.  In order to understand Plaintiff's allegation, it is necessary to discuss the terms of a credit agreement, dated February 28, 1997, that Matco and ABC entered into with BSB Bank & Trust Company, Deutsche Financial Services Corporation, and National Bank of Canada (referred to collectively in the credit agreement as the "Lenders").  See App. at Tab 9 and Def.'s Resp. to Pl.'s Verified Objection to Def.'s Mot. to Dismiss ("Def.'s Response") at Tab 1. The credit agreement provides for financing of up to $60,000,000 through, among other things, a revolving line of credit.  As of June 2000, the balance on the revolving line of credit was at least $40,000,000.[8]

Matco and ABC are referred to in the credit agreement as

_____

[8]Plaintiff does not allege that Matthews received these proceeds in his individual capacity, and Davis stated affirmatively at his deposition that the proceeds of the financing did not go Matthews.  App. at Tab 1, pp. 65-66.

"Borrowers". Pursuant to the terms of credit agreement, the Borrowers are jointly and severally liable for any loans made under the credit agreement. In addition, the Borrowers' subsidiaries, and Matthews in his individual capacity, were also required to guarantee the Borrowers' obligations under the credit agreement. See Def.'s Resp. at Tab 1, p. 20.[9] At all relevant times, Matthews was an individual guarantor of the Borrowers' obligations under the credit agreement.

---

[9]Relevant portions of the guaranties are included below:

4.1  Corporate. [E]ach Borrower shall execute a Guaranty for each Lender . . . guranteeing the payment and performance of the obligations of the other Borrower. Further, each Borrower will cause its current Subsidiaries to execute a Guaranty for each Lender and a Security Agreement for Lenders. Each Guaranty and Security Agreement shall be approved by the Board of Directors and the sole shareholder of each Borrower and Subsidiary.

4.2  Personal. All obligations of Borrowers to Lenders shall be personally guaranteed by James F. Matthews who shall execute a Guaranty for each Lender . . . . James F. Matthews shall execute this Agreement to acknowledge that it is understood and agreed that he is giving this guarantee to each Lender in order to induce the Lenders to make the Loans, that the Lenders are making the Loans in reliance on his Guaranty, and that his Guaranty is a prerequisite to the making of the Loans.

Def.'s Resp. at Tab 1, p. 20.

Plaintiff alleges that even though ABC is named as a Borrower under the credit agreement, and jointly and severally obligated thereunder, financial information prepared at the direction of Matco shows that ABC received little or none of the proceeds of that financing. See Objection at 4-5. Plaintiff alleges that through the exercise of its control, Matco "diverted" the assets of ABC to the credit agreement security requirements and transferred millions of dollars of ABC's cash to Matco and its other affiliates to service the payments due under the credit agreement and reduce Matthew's personal exposure thereunder. Id. at 5. Plaintiff alleges that at least $8,997,225 of ABC's cash was diverted during the calendar years 2000 and 2001 to meet financing obligations of Matco and its subsidiaries.[10] Plaintiff contends that this diversion of ABC's cash hindered ABC's ability to pay its vendors including Plaintiff.

Plaintiff further contends that Matco did not intend to perform its obligations to NLS under its guaranty of ABC's obligations. Nearly four months prior to the September 14, 2002

---

[10]Plaintiff contends that this diversion of cash is confirmed by ABC's IRS 2000 Form 1120S, which was an Exhibit at Davis' deposition. See App. at Tab 12, p. 4, line 17.

meeting between Russell and Davis, Matco and its affiliates had defaulted on the credit agreement and entered into the first of a series of forbearance agreements.[11]  Plaintiff alleges that because of the default Matco and its affiliates became subject to a "lockbox agreement" with their principal secured lenders under which they ceded control over their cash disbursements to their principal secured lenders.  Compl. at ¶ 11(C).[12]  Davis testified that he did not inform Russell that Matco and its affiliates, including ABC, were operating under a forbearance agreement during the September 14, 2000 meeting.  App. at pp. 155-158.  Davis further testified that he did not tell Russell at the meeting that Matco's and ABC's ability to pay Plaintiff's invoices were limited "because at that point, I didn't believe our ability to pay NLS or any other vendor was impacted by our borrowing base arrangements that were in effect at that time." App. at 158-159.

---

[11]The first forbearance agreement, dated May 18, 2000, is contained in the Plaintiff's Appendix at Tab 13.

[12]The credit agreement provides for the collection of the Borrowers' receivables after the occurrence of a default.  See Def.'s Resp. at Tab 1, p. 15 (Section 2.10 Collection of Receivables); see also, App. at Tab 1, pp. 44-48, 104-107.

V.    <u>Defendant's Uncontradicted Jurisdictional Allegations</u>

Matthews has alleged a number of facts in support of his argument that there is no basis for this Court to exercise personal jurisdiction over him.  Matthews submitted an affidavit in support of his motion to dismiss.  <u>See</u> Aff. of James Matthews Attached to Def. Resp. ("Matthews Aff.").  He contends that he has not visited New Hampshire in over ten years, nor has he conducted business within New Hampshire.  Matthews Aff., ¶ 2. Matthews further states that he did not own, use, or possess any real or personal property situated in New Hampshire during any time relevant to this litigation.  <u>Id.</u>, ¶ 4.

Davis submitted an affidavit in support of Matthews' motion to dismiss alleging facts pertaining to ABC and Matco in support of Matthews' argument that the facts do not justify piercing the corporate veil.  Davis contends in his affidavit that Matthews paid $758,764 for ABC stock at its inception in 1987, and paid in additional capital of approximately $5,700,000 through the end of the year 2000.  Aff. of Lawrence E. Davis Attached to Def.'s Response ("Davis Aff.") at ¶ 5.  Matthews provided additional capital to ABC in the form of a loan in the amount of $490,000 in 2001.  <u>Id.</u>  Davis contends that Matthews paid approximately

$871,000 for Matco stock and provided additional capital to Matco in the amount of approximately $7,500,000 through the year 2000.

Davis contends that ABC and Matco have had separate books, balance sheets and accounting since their inceptions. Davis Aff. at ¶ 8. ABC's and Matco's accounting and record keeping are completely separate and distinct from each other and that of Matthews individually. Id. at ¶ 9. Matthews' individual obligations are not paid by either ABC or Matco. Id. ABC and Matco have held corporate meetings and maintained corporate minutes through ABC's and Matco's corporate counsel. Id. at ¶ 10. Davis contends that Plaintiff knew at all times that it was dealing with ABC and that it was not dealing with Matthews individually. Id. at ¶ 11.

DISCUSSION

I. Waiver of Objection to Personal Jurisdiction

Plaintiff argues at the outset that Matthews waived any objection to this Court's personal jurisdiction over him because he included an alternative request that the Court dismiss Plaintiff's N.H. RSA 358-A Claim pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiff's argument is contrary to the plain language of Rule 12(b): "No defense or objection is waived by being joined

17

with one or more other defenses or objections in a responsive pleading or motion." See also, Fed. R. Civ. P. 12(g) ("A party who makes a motion under this rule may join with it any other motions herein provided for and then available to the party."). As Defendant's motion to dismiss was the first responsive motion filed after Plaintiff commenced this action, I find Plaintiff's waiver argument to be without merit.

II.  The New Hampshire Long-Arm Statute

"It is well established in diversity cases that 'the district court's personal jurisdiction over a nonresident defendant is governed by the forum's long-arm statute'" Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995); Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l, Inc., 982 F.2d 686, 690 (1st Cir. 1993); Pizarro v. Hoteles Concorde, Int'l, C.A., 907 F.2d 1256, 1258 (1st Cir. 1990).  The New Hampshire long-arm statute, N.H. Rev. Stat. Ann. 510:4(I), permits the exercise of personal jurisdiction over a nonresident defendant who, among other things, "transacts any business within this state."  The statute has been interpreted by the New Hampshire Supreme Court as affording jurisdiction over foreign defendants "to the full extent that the statutory language and

18

due process will allow." Sawtelle, 70 F.3d at 1388, quoting Phelps v. Kingston, 130 N.H. 166, 171, 536 A.2d 740 (1987); see also, Staffing Network, Inc. v. Pietropaolo, 145 N.H. 456, 458, 764 A.2d 905 (2000). When the forum state's long-arm statute is coextensive with the outer limits of due process, as here, "the court's attention properly turns to the issue of whether the exercise of personal jurisdiction comports with federal constitutional standards." Sawtelle, 70 F.3d at 1388.

III. Due Process Clause Requirements

The Due Process Clause in the Fourteenth Amendment to the Constitution bars a court from "imposing its will on persons whose actions do not place them in a position where they reasonably can foresee that they might be called to account in that jurisdiction." Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 287 (1st Cir. 1999), citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). This Court may only exercise personal jurisdiction over a defendant if the defendant has had "certain minimum contacts with New Hampshire such that maintenance of [a lawsuit] does not offend traditional notions of fair play and substantial justice." Jet Wine & Spirits, Inc. v. Bacardi & Co. Ltd., 298 F.3d 1, 7 (1st

19

Cir. 2002) (internal quotations and citations omitted).

If a defendant has continuous and systematic contacts with a state, courts in the state may exercise general jurisdiction over any action against the defendant even if those contacts are unrelated to the suit. Phillips Exeter Acad., 196 F.3d at 288; Mass. Sch. of Law at Andover, Inc. v. Am. Bar Assoc., 142 F.3d 26, 34 (1st Cir. 1998); United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1088 (1st Cir. 1992). Neither party contends that Matthews has had such contacts with New Hampshire, nor does it appear so from the record, so I do not address the issue of general jurisdiction further.

"In the absence of general jurisdiction, a court's power depends upon the existence of specific jurisdiction." Mass. Sch. of Law, 142 F.3d at 34. As its name suggests, specific jurisdiction is more narrow than general jurisdiction. A court may exercise specific jurisdiction over a defendant if "the cause of action arises directly out of, or relates to, the defendant's forum-based contacts." United Elec., Radio & Mach. Workers, 960 F.2d at 1088-89; see also, Mass. Sch. of Law, 142 F.3d at 34 (court must find that there is a demonstrable nexus between a

20

plaintiff's claims and a defendant's forum-based activities).

Courts in the First Circuit use a three-part test to determine whether exercising specific jurisdiction would comply with the requirements of the Due Process Clause. Phillips Exeter Acad., 196 F.3d at 288; Mass. Sch. of Law, 142 F.3d at 35; United Elec., Radio & Mach. Workers, 960 F.2d at 1089. In announcing the three-part test, the First Circuit summarized the analysis as follows:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

United Elec., Radio & Mach. Workers, 960 F.2d at 1089. As discussed below, I find that under the facts of the instant case, this Court's exercise of specific jurisdiction over Matthews would be contrary to the requirements of the Due Process Clause.

IV. Attribution of ABC's and Matco's Forum-State Contacts to Matthews to Establish Personal Jurisdiction

Plaintiff does not contend that Matthews has direct contacts with the State of New Hampshire that would enable this Court to

21

assert specific jurisdiction over him.  Rather, Plaintiff contends that ABC's and Matco's New Hampshire contacts may be attributed to Matthews for purposes of establishing personal jurisdiction.  Since there is no dispute that the Court would have personal jurisdiction over ABC and Matco, I do not further address whether their contacts would be sufficient to permit the Court to exercise personal jurisdiction over those entities.[13]  I next consider whether it is appropriate for this Court to pierce the corporate veils of ABC or Matco for the purpose of attributing their forum-based contacts to Matthews for purposes of obtaining personal jurisdiction over him.

A.  <u>Piercing the Corporate Veil As a Basis for Exercising Personal Jurisdiction Over Matthews</u>

"The general rule is that jurisdiction over the individual officers of a corporation may not be based merely on jurisdiction

_____

[13]Defendant does not dispute that this Court has personal jurisdiction over ABC and Matco.  Indeed, neither ABC nor Matco contested the exercise of this Court's jurisdiction in the related prior proceedings against them.  As further support for its allegation that the Court has personal jurisdiction over ABC and Matco, however, Plaintiff alleges that its sent invoices to ABC that stated that "The laws of the State of New Hampshire apply to this document and all transactions hereunder."  App. at Tab 5, ¶ 18.  Plaintiff also alleges that its communications with Davis pertaining to the performance of the contracts between NLS and ABC support this Court's exercise of personal jurisdiction over those entities.

over the corporation." <u>Escude Cruz v. Ortho Pharmaceutical Corp.</u>, 619 F.2d 902, 906 (1st Cir. 1980); <u>see also</u>, <u>Hahn v. Vermont Law School</u>, 698 F.2d 48, 52 (1st Cir. 1983) (same); <u>Velcro Group Corp. v. Billarant</u>, 692 F. Supp. 1443, 1449 (D.N.H. 1988) (same). There is support in the First Circuit, however, for the principle that the forum-state contacts of a corporation may, under appropriate circumstances, be attributed to a nonresident defendant in order to establish personal jurisdiction over the defendant. <u>See</u> <u>De Castro v. Sanifill, Inc.</u>, 198 F.3d 282, 283-284 (1st Cir. 1999) (evidence did not establish that the court should pierce the corporate veils of two subsidiaries to exercise jurisdiction over a foreign parent corporation and unnamed individual defendants); <u>United Elec., Radio and Machine Workers of Am.</u>, 960 F.2d at 1091 (if a subsidiary is properly subject to the court's jurisdiction and its corporate independence may be disregarded, the parent is subject to the court's jurisdiction), <u>rev'd on other grounds</u>, 987 F.2d 39 (1st Cir. 1993); <u>Snell v. Bob Fisher Enter., Inc.</u>, 106 F. Supp.2d 87, 90 (D. Me. 2000) ("Piercing the corporate veil has been recognized, in some circumstances, as a viable means to establish jurisdiction."). Although a corporation is treated as a separate

23

legal entity and its liabilities are not attributable to its owners and officers, the corporate separateness that shields an owner from liability may be disregarded under certain conditions. Scully Signal Co. v. Joyal, 881 F. Supp. 727, 736 (D.R.I. 1995). The result of this corporate disregard is that if the corporation is found liable or subject to the jurisdiction of the court, the owner is likewise subject to liability and personal jurisdiction. Id. Thus, the forum-state contacts of a corporation may be attributed to an individual who is an officer, director, or shareholder of the corporation when evidence is presented that shows that the corporation is the alter ego of the individual, or where other circumstances permit the court to pierce the corporate veil. Id.

B.   Choice of Law for Veil Piercing Analysis

Neither party analyzes which state's law should apply to the question of whether ABC's and Matco's corporate veils should be pierced in the instant case. On the one hand, the Plaintiff assumes that the Court will apply New Hampshire law. See Objection at 14-15. On the other hand, the Defendant contests this Court's authority to pierce the corporate veils of a New York and Delaware corporation to establish jurisdiction over a

24

non-resident defendant.  See Def.'s Mot. to Dismiss at 3.

Defendant's challenge to the Court's authority is unsupported,

and contrary to existing precedent in this Circuit.  A review of

analogous cases shows that the court should engage in a choice of

law analysis to determine which state's law applies to the issue

of whether a corporate veil should be pierced.  See Wadsworth,

Inc. v. Schwarz-Nin, 951 F. Supp. 314, 320-322 (D.P.R. 1996)

(refusing to assume that the law of the forum applies to the

question of whether to pierce the corporate veil and engaging in

a choice of law analysis); Scully Signal Co., 881 F. Supp. at 736

(finding that the laws of New York, Rhode Island and

Massachusetts all could potentially apply in the veil piercing

analysis under the facts of the case); see also, Goya Foods, Inc.

v. Unanue, 233 F.3d 38, 43 n.4 (1st Cir. 2000) (finding that the

law of the state of incorporation may supply the presumptively

applicable legal regime for veil piercing claims).[14]

---

[14]One district court has stated that "[i]n deciding whether
to pierce the corporate veil in order to establish jurisdiction,
the Court will apply the law of the forum state." Snell v. Bob
Fisher Enterprises, 106 F. Supp.2d at 90 (citing De Castro v.
Sanifill, Inc., 198 F.3d 282, 283 (1st Cir. 1999)).  That
conclusion appears to be based on a misreading of De Castro.  In
De Castro, the plaintiffs sought to pierce the corporate veils of
two wholly-owned Puerto Rican subsidiaries to reach a Delaware
parent corporation.  198 F.3d at 283-284.  In that context, the
district court, located in Puerto Rico, applied Puerto Rico law

When a court, sitting in diversity, considers a case in which more than one state has an interest, the court must determine which state's law to apply. To make this determination, this Court applies New Hampshire's choice of law rules. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941) (holding that the forum state's choice of law doctrine governs); American Title Ins. Co. v. East West Fin. Corp., 959 F.2d 345, 348 (1st Cir. 1992) (same). Under New Hampshire law, the court resolves potential conflicts of law by first deciding whether the relevant law is substantive or procedural. Keeton v. Hustler Magazine, Inc., 131 N.H. 6, 13, 549 A.2d 1187, 1191 (1988). If the court finds the relevant law is substantive, it then determines whether the New Hampshire law actually conflicts with the law of another interested state. Id. If the laws are in actual conflict, the court chooses which state's law to apply by employing a balancing test composed of five choice-influencing considerations: (1) the predictability of results; (2) the maintenance of reasonable orderliness and good relationships

---

and found that sufficient facts did not exist to pierce the corporate veils of the Puerto Rican subsidiaries. Id. at 285. The De Castro court did not find, as a general matter, that the law of the forum state always applies to the question of whether to pierce the corporate veil.

among the states in the federal system; (3) simplification of the judicial task; (4) the advancement of the governmental interest of the forum; and (5) the court's preference for what it regards as the sounder rule of law.  Id. at 14, 549 A.2d at 1192 (citing LaBounty v. American Ins. Co., 122 N.H. 738, 741 451 A.2d 161, 163 (1982); Clark v. Clark, 107 N.H. 351, 353-55, 222 A.2d 205, 208-09 (1966)).  The standard for piercing the corporate veil is substantive law.  Data General Corp. v. Grumman Data Sys. Corp., 886 F. Supp. 927, 931 (D. Mass. 1994) (finding that the law pertaining to piercing the corporate veil is a substantive body of law).  Although the standards do not vary widely in most states, the standards may diverge enough to be outcome determinative.  Wadsworth v. Schwarz-Nin, 951 F. Supp. at 321 n.4 (citing Resolution Trust Corp. v. Chapman, 29 F.3d 1120 (7th Cir. 1994)).  After reviewing the legal standards of all three potentially relevant jurisdictions, it does not appear to the Court that the Plaintiff has made a prima facie showing that meets the requirements to pierce the corporate veil under the law of any of the jurisdictions.  Therefore, I do not engage in a balancing analysis.

C.    Veil Piercing Standards

It appears that New Hampshire, New York and Delaware all have sufficient contacts with this action that any of their veil piercing standards might potentially apply.  The alleged wrong to the Plaintiff, a New Hampshire corporation, occurred in New Hampshire.  Matco is a Delaware corporation with a principal place of business in New York.  ABC is a New York corporation with a principal place of business in that state.

It is often repeated in New Hampshire cases that "New Hampshire courts do not 'hesitate to disregard the fiction of the corporation' when circumstances would lead to an inequitable result."  Terren v. Butler, 134 N.H. 635, 639, 597 A.2d 69 (1991) (brackets omitted), citing Ashland Lumber Co., Inc. v. Hayes, 119 N.H. 440, 441, 402 A.2d 201 (1979) (quoting Peter R. Previte, Inc. v. McAllister Florist, Inc., 113 N.H. 579, 581, 311 A.2d 121 (1973)).  In Druding v. Allen, 122 N.H. 823, 451 A.2d 390 (1982), the New Hampshire Supreme Court found that "a court may pierce the corporate veil if a shareholder suppresses the fact of incorporation, misleads his creditors as to the corporate assets, or otherwise uses the corporate entity to promote injustice or fraud."  Id. at 827.  "A lack of practical separation between the

28

shareholder and the corporation, so that the corporation is merely the shareholder's 'alter-ego,' is an important sign that the shareholder has abused the corporate form." Bartholomew v. Delahaye Group, Inc., Civ. No. 95-20-B, 1995 WL 907897 at *11 (D.N.H. Nov. 8, 1995), citing Terren, 134 N.H. at 640.

In direct contrast to New Hampshire law, "persuading a Delaware Court to disregard the corporate entity is a difficult task." Harco Nat. Ins. Co. v. Green Farms, C.A. No. 1131, 1989 WL 110537 at *4 (Del. Ch. Sept. 19, 1989). To state a cognizable claim for piercing the corporate veil under Delaware law, the plaintiff must allege facts that, if taken as true, demonstrate the defendant's complete domination and control over the corporation. Wallace v. Wood, 752 A.2d 1175, 1183 (Del. Ch. 1999). This degree of control requires "exclusive domination and control . . . to the point that [the corporation] no longer ha[s] legal or independent significance of [its] own." Id., citing Hart Holding Co., Inc. v. Drexel Burnham Lambert, Inc., C.A. No. 11514, 1992 WL 127567 at *11 (Del. Ch. May 28, 1992). Piercing the corporate veil under the alter ego theory "requires that the corporate structure cause fraud or similar injustice." Outokumpu Eng'g Enter., Inc. v. Kvaerner Enviorpower, Inc., 685 A.2d 724,

29

729 (Del. Supr. 1996); see also, Geyer v. Ingersoll Pub. Co., 621 A.2d 784, 793 (Del. Ch. 1992) (finding that commission of a fraud and the existence of an alter ego relationship are the bases for individual liability for corporate acts).

New York law on piercing the corporate veil may fall somewhere in between that of New Hampshire and Delaware. The New York Court of Appeals has stated that, "[b]roadly speaking, the courts will disregard the corporate form, or, to use accepted terminology, pierce the corporate veil, whenever necessary to prevent fraud or to achieve equity." Walkovszky v. Carlton, 18 N.Y.2d 414, 417, 223 N.E.2d 6, 7-8, 276 N.Y.S.2d 585, 587 (N.Y. 1966) (internal quotations omitted). It is generally accepted under New York law that in order to pierce the corporate veil the plaintiff must show that: (1) the owners exercised complete domination of the corporation with respect to the challenged transaction, and (2) that such domination was used commit a fraud or wrong against the plaintiff resulting in the plaintiff's injury. Morris v. New York State Dep't of Taxation & Fin., 82 N.Y.2d 135, 141, 623 N.E.2d 1157, 1160-61, 603 N.Y.S.2d 807, 810-11 (N.Y. 1993); Austin Powder Co. v. McCullough, 216 A.D.2d 825, 826, 628 N.Y.S.2d 855, 856 (N.Y. App. Div. 1995).

D.  The Facts of the Instant Case Weigh Against
    Veil Piercing

    1.  ABC and Matco Were Not Matthews' Alter Egos

The facts alleged by the Plaintiff do not meet the standards for veil piercing in part because they do not demonstrate that ABC and Matco were merely sham entities or Matthews' alter egos. ABC and Matco, were incorporated in 1987 and 1996 respectively. Prior to 2001 both corporations had substantial operations involving millions of dollars worth of business. Defendant's uncontraverted allegations show that ABC and Matco existed as legally significant entities wholly apart from Matthews. ABC and Matco kept separate books, balance sheets and accounting records. ABC's and Matco's finances were separate and distinct from Matthews' individual finances and Matthews' individual obligations were not paid by either ABC or Matco. ABC and Matco observed corporate formalities such as holding corporate meetings and maintaining corporate minutes. And Plaintiff knew at all times that it was contracting with ABC and not Matthews individually. Indeed, Matthews was not named as a defendant in either of the prior actions in this Court. In addition to observing corporate formalities, ABC and Matco had substantial capital. Matthews, the sole shareholder, paid capital to Matco

31

and ABC through the year 2000 of approximately $14,800,000. Davis alleged that Matthews contributed $490,000 in capital to ABC alone in 2001.

2. Plaintiff Has Not Alleged Facts That Show Injustice or Fraud

Plaintiff's factual allegations fall short in the veil piercing analysis because the facts alleged do not show that Matthews used ABC to promote injustice or fraud on the Plaintiff. Plaintiff expressed concern about its relationship with ABC in a September 1, 2000 after allegedly having conducted hundreds of transactions with ABC. After Plaintiff sued to recover its damages for ABC's breach of contract, ABC made payments to Plaintiff pursuant to a settlement agreement between April 2001 and November 2001 reducing its outstanding debt to Plaintiff from $669,946.46 to $244,040.64. ABC ceased operations sometime after November 2001. It is undisputed that Matco's other creditors filed a petition for involuntary bankruptcy against Matco shortly thereafter in February 2002. These facts may show the existence of two failed businesses, but they do not demonstrate that Matthews directed a wrong at the Plaintiff.

Plaintiff's primary allegations in favor of piercing the corporate veil are that ABC and Matco were insolvent during the

time that ABC contracted with Plaintiff, and that Matco diverted ABC's cash to satisfy the obligations under the credit agreement to the detriment of ABC's creditors. Plaintiff further alleges that it was misled as to Matco's and its affiliates' financial conditions and induced to extend unwarranted credit to ABC.

Accepting Plaintiff's allegation that ABC was insolvent during the period that ABC contracted with Plaintiff, that fact, in an of itself, is insufficient to justify piercing the corporate veil. Even in New Hampshire, which appears to have the most liberal standard for piercing the corporate veil here, the courts recognize that "one of the desirable and legitimate attributes of the corporate form of doing business is the limitation of the liability of the owners to the extent of their investment." Peter R. Previte, Inc. v. McAllister Florist, Inc., 113 N.H. at 584, 311 A.2d at 123. "Thus when a corporate enterprise becomes insolvent a creditor may not look to the individual stockholders for payment of his debt in the absence of unusual circumstances." Id. At bottom, Plaintiff contends that the "diversion" of cash from ABC to satisfy the obligations on the credit agreement qualifies as an unusual circumstance justifying Plaintiff's request to pierce the corporate veil to

33

render Matthews individually liable for debt owed by ABC.  See Objection at 15.  The Court disagrees.  At best, Plaintiff has shown a possible justification for piercing the corporate veil of ABC to render Matco liable.  See e.g., Williams v. Reifsteck, No. Civ. A. 3:96CV2758D, 1997 WL 419554 at *3 (N.D. Tex. July 8, 1997) (plaintiff's evidence, which tended to show only that the individual defendant was a participant in decisions regarding the transfer of funds between related corporations, may suggest that the relevant corporate entities should be disregarded to reach other corporate entities, but does not demonstrate that the corporations were a facade for the individual's activities).  There is no support for the further leap needed to render Matthews liable.  In particular, I note that there is no evidence that shows that Matthews personally received any of the proceeds from the revolving loan.  Nor is there is any evidence that any of the cash that Plaintiff alleges was diverted from ABC went to Matthews individually or to satisfy any of Matthews' personal obligations.

Plaintiff argues that Matthews, as an individual guarantor of the credit agreement, ultimately benefitted from the diversion of ABC's cash to satisfy the revolving loan because it reduced

34

Matthews' individual exposure. Though it could be said that Matthews benefitted from ABC's joint obligation with Matco under the credit agreement since ABC contributed more of its cash to satisfaction of the revolving loan than it drew from the line of credit, the Court finds that this allegation does not demonstrate an intent to injure Plaintiff. Following Plaintiff's reasoning to its logical extension, any payment by Matco or ABC that reduced the obligation on the revolving loan should be considered a personal benefit to Matthews because it reduced his potential individual exposure.[15] According to Plaintiff's theory, however, Matthews would be personally liable to any of ABC's and Matco's unpaid creditors not just NLS. Plaintiff's argument goes too far. Moreover, Plaintiff has not alleged any specific action that Matthews took to reduce his exposure on the individual guaranty.

Plaintiff's allegation that it was mislead as to Matco's and its affiliates' financial conditions, and therefore extended unwarranted credit to ABC, does not show a basis for this Court's assertion of personal jurisdiction over Matthews. Plaintiff has not alleged any facts that show that the alleged fraudulent

---

[15]Matthews was not a borrower under the credit agreement, and therefore he was not directly obligated to the Lenders.

misrepresentations may be attributed to Matthews.  Plaintiff alleges that Matthews delegated the responsibility for responding to Russell's September 1, 2000 letter to Davis, a claim disputed by Matthews and Davis in their depositions.  Even accepting Plaintiff's allegations as true, there is no support for an inference that Matthews directed Davis to mislead Plaintiff as to the financial condition of Matco and its affiliates.  Cf., Escude Cruz, 619 F.2d at 907 (finding that a corporate officer is liable for torts in which he personally participated in).  Personal jurisdiction over Matthews may not be based merely on his status as a corporate officer and shareholder.  Id.

The Court finds no basis to pierce the corporate veils of ABC and Matco to render Matthews personally liable in this action based on the facts alleged by the parties.  And without a viable veil piercing theory, it is clear that Matthews does not have minimum contacts with the State of New Hampshire sufficient for this Court to exercise personal jurisdiction over him.  I find, therefore, Defendant's motion to dismiss should be granted.

## CONCLUSION

For the reasons set forth above, Matthews' Motion to Dismiss for Lack of Personal Jurisdiction (document no. 6) is granted.

**SO ORDERED.**

_____
James R. Muirhead
United States Magistrate Judge

Date: March 7, 2003

cc:    Lawrence M. Edelman, Esq.
       Paul B. Kleinman, Esq.